648 A.2d 193

ANNE ARUNDEL COUNTY, Maryland

v.

FIDELITY & DEPOSIT COMPANY OF MARYLAND.

No. 11, Sept. Term, 1994.

Court of Appeals of Maryland.

Oct. 6, 1994.

Stephen M. LeGendre, Deputy County Atty., and Judson P. Garrett, Jr., County Atty., Annapolis, for appellant.

Robert M. Wright (Adam C. Harrison, Whiteford, Taylor, and Preston, all on brief), Baltimore, for appellee.

J. Joseph Curran, Jr., Atty. Gen., Julia P. Davis, Asst. Atty. Gen., on brief, Baltimore, amicus curiae.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

RODOWSKY, Judge.

In this appeal we hold that the one year statute of limitations under the Little Miller Act applies only to claims on payment bonds and does not apply to claims on performance bonds.

The appellant, Anne Arundel County, Maryland (the County), owns and operates the Cattail Creek Sewage Pumping Station. On or about February 26, 1986, a sixteen inch, cast iron pipe, force main on the discharge side of the pumping station ruptured, causing erosion and other damage. The pumping station and its associated mains had been constructed for the County by Dunton, Inc. under a contract dated August 24, 1976. Also on that date the appellee, Fidelity & Deposit Company of Maryland (F & D), as surety, and Dunton, Inc., as principal, jointly and severally bound themselves to the County, as obligee, under a bond conditioned on the performance of the pumping station construction contract. To recover its costs of clean up and repair, the County filed this action on June 6, 1988 against F & D and others. The claim against F & D alleges breach of the performance bond.

Approximately four years later F & D moved for summary judgment, contending that the State statute relating to security for construction contracts of state and local subdivisions (the Little Miller Act or LMA) required that the County's performance bond claim have been filed "within 1 year after the [County] finally accepts the work performed under the contract." Maryland Code (1985, 1988 Repl.Vol.), § 17–109(b) of the State Finance and Procurement Article (FP). Work under the pumping station contract had been conditionally accepted by the County on or about November 16, 1977, subject to a one year maintenance period. The County con-

tended that the one year period provided by FP § 17–109(b) applied only to payment bonds and that the twelve year period of limitations for suits on certain specialties was applicable.[1] The circuit court agreed with F & D's construction of the LMA and granted summary judgment dismissing F & D from the case.

The circuit court also certified the judgment in favor of F & D as final, pursuant to Maryland Rule 2–602. After the County had appealed to the Court of Special Appeals, this Court granted the County's petition for certiorari prior to the consideration of the matter by the intermediate appellate court. We also granted leave to the State of Maryland to file a brief as amicus curiae.

The ground of decision by the circuit court on summary judgment presents an issue of construction of the Little Miller Act, FP §§ 17–101 through 17–110. Understanding the issue requires us to present a considerable portion of the statute. The LMA "applies only to security for a construction contract," § 17–102(b), that is let by a "public body," meaning, in general, the State or a local government. § 17–101(d). "Before a public body awards a construction contract exceeding $50,000, the contractor shall provide payment security and performance security that meet the requirements of § 17–104 of this subtitle." § 17–103(a)(1). " 'Payment security' means security to guarantee payment for labor and materials ... under a contract for construction." § 17–101(b). " 'Performance security' means security to guarantee the performance of a contract for construction." § 17–101(c). The security

---

1. Md.Code (1974, 1989 Repl.Vol.), § 5–102(a) of the Courts and Judicial Proceedings Article establishes a twelve year statute of limitations for certain specialties, including a "[b]ond except a public officer's bond." § 5–102(a)(2). The statute of limitations for specialties has been applied to performance bonds. *See President & Directors of Georgetown College v. Madden*, 505 F.Supp. 557, 564 (D.Md.1980), *aff'd in part, dismissed in part*, 660 F.2d 91, 95 (4th Cir.1981); *Board of Educ. for Use of IBM Corp. v. Lang*, 182 Md. 132, 137, 32 A.2d 693, 695 (1943). *See also* R. Wright & P. Grimm, *Contract Surety Bonds, in* Surety Bonds & Insurance in the Construction Industry § 8, at 27–29 (1992) (MICPEL).

may be a bond executed by a surety company, cash, or other security satisfactory to the public body. § 17–104.

Under the LMA the term "supplier" is defined to mean "a person who supplies labor or materials." § 17–101(e). Section 17–108, dealing with an action by a supplier, reads:

"(a) *In general.*—Subject to subsection (b) of this section, a supplier may sue on payment security if the supplier:

(1) supplied labor or materials in the prosecution of work provided for in a contract subject to this subtitle; and

(2) has not been paid in full for the labor or materials within 90 days after the day that the person last supplied labor or materials for which the claim is made.

(b) *Payment owed by subcontractor.*—(1) A supplier who has a direct contractual relationship with a subcontractor or sub-subcontractor of a contractor who has provided payment security but no contractual relationship with the contractor may sue on the security if the supplier gives written notice to the contractor within 90 days after the labor or materials for which the claim is made were last supplied in prosecution of work covered by the security.

(2) A notice under this subsection:

(i) shall state with substantial accuracy the amount claimed and the person to whom the labor or material was supplied; and

(ii) shall be sent by certified mail to the contractor at the contractor's residence or a place where the contractor has an office or does business.

(c) *Certification of security.*—(1) On request by a person who submits an affidavit verifying that the person has supplied labor or materials but has not been paid or is being sued under this section, the Comptroller or the officer in charge of the office where the payment security or evidence of security is required to be filed shall issue:

(i) a certified copy of the payment bond; or

(ii) for other security, a certified statement of the security.

(2) The person requesting certification shall pay a reasonable fee, set by the Comptroller or other officer required to issue the certification, to cover costs of preparation.

(3) A certification under this section is prima facie evidence of the contents, execution, and delivery of payment security."

Venue, limitations, and costs are addressed in § 17–109 which reads:

"(a) *Venue.*—An action under this subtitle shall be filed in the appropriate court of the county where:

(1) the contract was executed and performed; or

(2) the contractor has its principal place of business.

(b) *Limitations period.*—An action under this subtitle shall be filed within 1 year after the public body finally accepts the work performed under the contract.

(c) *Costs.*—An obligee named in a bond or a trustee for any other security is not liable for any costs in connection with an action under this subtitle."

In the action before us F & D, relying on § 17–109(b), submits that a suit on a performance bond is "[a]n action under this subtitle." F & D points to the requirement in § 17–103(a) that the contractor provide both payment security and performance security on public construction contracts over $50,000, from which F & D concludes that an action is "under this subtitle" if it claims breach of the condition of any bond *required by* the subtitle. The circuit court considered that construction to be the plain meaning of the statute.

F & D's reading of the statute finds support in a dicta statement, concerning an earlier codification of the LMA, made by this Court in *United States Fidelity & Guar. Co. v. Hamilton & Spiegel, Inc.,* 241 Md. 133, 215 A.2d 735 (1966). In presenting the question to be decided, this Court said:

"Since subsection (d) of § 11 of Art. 90, relating to where and when suits on performance and payment bonds should be brought, provides in pertinent part that 'no such suit shall be commenced after the term of one year after the

date of final acceptance of the work performed under the contract,' the question to be decided is on what date was the work contracted for *finally accepted* under the terms and conditions of the construction contract."

*Id.* at 135, 215 A.2d at 736–37. There was, of course, no limitations issue in that case, and this Court was not required to focus on any distinction between payment and performance bonds as is here argued by the County.

The County points out that there are no provisions of the LMA that deal with actions on performance bonds. Actions on payment bonds, by contrast, are expressly dealt with in § 17–108. Thus, argues the County, an action "under this subtitle" is only an action on a payment bond. When a public body sues on a performance bond, it sues directly on the bond, under the County's theory, and not "under this subtitle." When a supplier sues on a payment bond, the supplier brings an action that is specifically authorized by the subtitle, and therefore sues "under" it.

The County finds further support for its reading in § 17–109(c) which exonerates an obligee named in a bond from liability for costs "in connection with an action under this subtitle." It would be an absurd construction of § 17–109(c), argues the County, to absolve the public body obligee from liability for costs in an action on a performance bond that the public body brings and then loses, while it is entirely reasonable to exonerate the public body obligee in an action brought by a supplier on a payment bond.

The parties also argue from the legislative history of the LMA in support for their respective positions. That history ultimately traces to the Heard Act. Act of August 13, 1894, ch. 280, 28 Stat. 278. The present LMA, FP §§ 17–101 through 17–110, in the particulars relevant to the case before us, is substantially Chapter 10 of the Acts of 1959.[2] The 1959

---

2. The wanderings through the Code of the Little Miller Act from its initial codification in former Art. 90, § 11 to its present location in the State Finance and Procurement Article is traced in *Atlantic Sea–Con,*

Maryland statute was "patterned after the Miller Act which has been enacted by the Congress for the Federal Government. . . ." Report of the Legislative Council of Maryland to the General Assembly of 1959—Proposed Bills—Special Committee Reports at 17. The Miller Act, 40 U.S.C. §§ 270a through 270d, is the Act of August 24, 1935, ch. 642, 49 Stat. 793. It superseded the Heard Act. The 1959 Maryland statute also repealed Md.Code (1957), Art. 90, § 11 which had been enacted by Chapter 127 of the Acts of 1918. The 1918 Maryland statute had been "Maryland's version of the federal Heard Act. . . ." *Atlantic Sea–Con, Ltd.,* 321 Md. at 278 n. 2, 582 A.2d at 982 n. 2.

The LMA of 1959 contains the same problem of statutory construction as does the present LMA. The 1959 enactment consisted of one Code section, former Art. 90, § 11. Subsection (a) contained the requirement for the contractor to post both types of bonds. Subsection (c) provided for an action on a payment bond by one "who has furnished labor or material in the prosecution of the work provided for in such contract, in respect of which a payment bond is furnished under this section. . . ." Subsection (d), the precursor of present FP § 17–109, read:

> "(d) Every suit instituted under this section shall be brought . . . in the political subdivision in which the contract was to be performed . . . but no such suit shall be commenced after the term of one year after the date of final acceptance of the work performed under the contract. The obligee named in the bond shall not be liable for the payment of any cost or expenses of any such suit."

This above-quoted subsection was patterned on 40 U.S.C. § 270b(b) which, prior to its amendment in August 1959, read:

> "(b) Every suit instituted under this section shall be brought in the name of the United States for the use of the person suing, in . . . any district in which the contract was

*Ltd. v. Robert Dann Co.,* 321 Md. 275, 278 n. 2, 582 A.2d 981, 982 n. 2 (1990).

to be performed and executed ... but no such suit shall be commenced after the expiration of one year after the date of final settlement of such contract. The United States shall not be liable for the payment of any costs or expenses of any such suit." [3]

40 U.S.C. § 270b consists only of subsections (a) and (b), and (a) deals exclusively with actions on payment bonds by persons who had "furnished labor or material in the prosecution of the work provided for in such contract...." Thus, the structure of the Miller Act is such that the reference to a suit "instituted under this section" does not present the problem of construction found in FP § 17–109(b).

Here the County submits that, because the LMA is patterned after the Miller Act, the action "under this subtitle" referred to in FP § 17–109(b) is limited to an action on a payment bond. F & D counters by noting the different structure of the LMA from that of the Miller Act. The General Assembly in the 1959 enactment did not divide the statute into separate sections, but instead placed the requirement for both a performance bond and a payment bond in one and the same Code section with all of the other provisions, and then the General Assembly made the one year limitations provision applicable to "every suit instituted under this subtitle...." In the instant matter the circuit court considered that difference from the Miller Act to be intentional and further to evidence a legislative intent to establish a one year statute of limitations for actions on both performance and payment bonds.

The County further submits that a construction that limits suit on a performance bond by a public body to a one year window following final acceptance produces an absurd result in comparison to suits by private owner-obligees. A private owner has twelve years within which to sue on a common law

---

**3.** This section of the Miller Act was amended by the Act of August 4, 1959, Pub.L. 86–135, § 1, 73 Stat. 279 to utilize the "day on which the last of the labor was performed or material was supplied by him" as the date or event measuring the beginning of the one year period.

performance bond and, argues the County, there is no public policy reason for disadvantaging taxpayers in suits on statutorily required, public works performance bonds. Indeed, argues the County, were such a startling result actually intended, it necessarily would be spelled out much more explicitly than the ambiguous reference to an action "under this subtitle."

In opposition to the County's policy argument, F & D submits two points. First, it compares the 1959 LMA with the 1918 Maryland version of the Heard Act. The 1918 Maryland statute read in part that

"any bond ... conditioned for the faithful performance of any contract for construction ... shall not be approved ... unless the obligors bind themselves therein to the payment of all just debts for labor and materials incurred, through sub-contract or in any other manner, by ... the person ... to whom such contract has been given...."

The 1918 statute provided that, in the event there was liability to the State, that liability was to be preferred and paid in full before any payment was made for labor or materials. The statute further provided that an action to enforce the payment features of the bond should be brought in the name of the obligee, for the benefit pro rata of all labor or materials creditors, and be instituted within one year from completion of the whole work. F & D contends that, under this combination bond, the State or its agency necessarily had to assert its claim against the bond within the same one year period applicable to claims of suppliers of materials and of labor. Otherwise, the obligee would risk loss of the penal amount of the bond, and of the State's preference, because the claims of suppliers could exhaust the bond. Thus, argues F & D, as a practical matter, a one year statute operated against the State and its agencies under the 1918 enactment. As F & D sees it, the 1959 Maryland statute simply made into law what the prior practice had been. This argument rests entirely on inferences drawn from the face of the 1918 statute, without citation to any additional legal or historical support.

Second, F & D submits that there is a sound policy reason for the General Assembly to have imposed in 1959 a one year statute of limitations on actions by any public body on performance as well as on payment bonds. A one year statute keeps performance bonds available at reasonable costs. Absent the special period of limitations under the LMA that specifically applies to the State, F & D suggests that there would be no limitations on a performance bond action by the State. An extended, or open ended, period before limitations would run is said adversely to affect the protection of the public body because it adversely affects the willingness of commercial sureties to undertake the performance bond risk.

We do not believe that the General Assembly was concerned in 1959 with an extended or open ended period of limitations on performance bonds. The explanation given in the Legislative Council report described above is that "[t]he main purpose of the Bill is to provide greater protection to subcontractors on contracts awarded by the State or any of its political subdivisions or public agencies." Report to the General Assembly of 1959, *supra*, at 17. It was not until 1980 when the United States District Court for the District of Maryland decided *President & Directors of Georgetown College v. Madden*, 505 F.Supp. 557, that any prominence, at least in this State, was given to the possibility that an action might be brought directly on a performance bond after the statute of limitations had barred a remedy against the contractor for breach of the construction contract. Thus, it is most unlikely that the General Assembly in 1959 was narrowly limiting a public body's right to sue on a performance bond in anticipation of litigation attempting to hold the surety liable to the public body for latent defects in the construction after the contractor could no longer be held liable for breach of the construction contract.

■ We conclude that the County has construed the LMA correctly. An action "under" the LMA subtitle is an action authorized by that subtitle; it is not an action on a bond required by that subtitle. The action authorized by that

subtitle is a supplier's action on a payment bond. The distinction between the concepts is reflected in the evolution of contract law relating to third party beneficiaries. A performance bond is a contract in which the promise runs directly from the surety, or directly from the surety and the principal, as obligors, to the owner as obligee. In bonds required by the LMA, that owner-obligee is a public body. There was no need for the predecessor statutes to the LMA to authorize suit by a public body on a performance bond because the breach of the condition of the bond gives rise to an action recognized at common law as one asserted by a promisee who is in privity with the promisor. A payment bond required by the LMA is also a promise made by the surety, or by the surety and the principal, directly to the owner-obligee. The purpose of the payment bond requirements of statutes such as the LMA is to protect suppliers of labor and materials. Even if a statute requiring a payment bond on public construction contained no express authorization for a supplier to sue on the payment bond, as found in FP § 17–108(a), courts today have no difficulty in recognizing the supplier's right to sue as a third party beneficiary of the payment bond. *See American Fidelity Co. of Montpelier, Vt. v. State to Use of Short & Walls Lumber Co.*, 128 Md. 50, 97 A. 12 (1916) (in supplier's suit on payment bond required for state highway construction by Chapter 218 of the Acts of 1910, omission from statute of express authorization for supplier to sue not fatal to action). Nevertheless, that unpaid suppliers are third party beneficiaries of construction contract payment bonds was not so well established when the Heard Act was enacted in 1894.

Illustrating one school of legal reasoning in the pre-Heard era is *Union Ry. Storage Co. v. McDermott*, 53 Minn. 407, 55 N.W. 606 (1893). The plaintiff had supplied bricks to the prime contractor constructing officers' quarters on the military reservation of Fort Snelling, but had not been paid. The contractor had furnished a bond with individual sureties to the United States, conditioned on the performance of all covenants in the contract, specifically " 'including the covenant that the said [contractor] shall be responsible for and pay all liabilities

incurred for labor and material in fulfillment of said contract.' " *Id.* at 410, 55 N.W. at 607. The Supreme Court of Minnesota, affirming a judgment entered on demurrer in favor of the sureties, said:

"The legal question here presented—as to the right of the plaintiff, a stranger to the contract, to sue upon it—has recently been considered in *Jefferson v. Asch, post* [53 Minn.], p. 446, (55 N.W.Rep. 604,) and the rule there declared is decisive of this case. The plaintiff has no right of action on the bond. He was a complete stranger to it. There was no privity between him and the promisee,—the United States. The latter rested under no duty or obligation to him upon which he could assert any legal or equitable right to avail himself of the benefit of, and enforce, the promise made by the defendants to the United States. Nor was the promisee—the United States—interested in having this part of the contract performed. It would be no benefit to the United States if the contractor should pay his own debts for material purchased by him. It would be in no way prejudiced if he should not pay. Its property could not be subjected to a lien therefor. In brief, the right of the plaintiff to sue upon this bond has no other legal foundation than the bare fact that the defendants had by that instrument entered into an obligation towards a mere stranger to the plaintiff that his debt should be paid. In such a case the stranger to the contract cannot sue upon it. Our decision above cited is decisive."

*Id.* at 411, 55 N.W. at 607.

Much the same point is made, but under even more remarkable facts, in *Buffalo Cement Co. v. McNaughton,* 90 Hun. 74, 35 N.Y.S. 453 (1895), *aff'd,* 156 N.Y. 702, 51 N.E. 1089 (1898). In conjunction with the execution of an 1892 contract for the construction of a sewer for the City of Buffalo, the contractor furnished a combined payment and performance bond. An ordinance of the city required inclusion of the payment clause in performance bonds, and the ordinance also required " 'a further clause authorizing each and every such person to bring an action upon such bond, in the same manner and with the

same effect as if he were specifically named in the bond.' " 35 N.Y.S. at 454. A supplier of cement to the project sued on the bond and lost. The court said that "[t]he plaintiff is obliged to rely upon a simple promise made to the city by the defendants, in an instrument to which the plaintiff was not a party . . . there being an absence of anything showing that the city could suffer any damage by the failure of [the contractor] to pay the plaintiff for the cement." *Id.* at 455.

In 1928 Professor Corbin, as part of an overview of actions on contractors' common law surety bonds, said:

"There are numerous cases holding that laborers, materialmen, and other subcontractors have no enforceable right against the surety, even though the terms of the principal contract make it the duty of the contractor to pay the third parties, and even though the surety bond is expressly conditioned on full performance of all his promises by the contractor. Indeed, in some of the cases the bond is specifically conditioned on payment of the debts for labor and material. These cases at times evince a fondness for the supposed common law rule requiring 'privity;' some cases rest upon the false but still lingering idea that the third party's right depends upon there being some pre-existing duty owed to him by the promisee, thus explaining why the promisee came to make a contract requiring payment to the third party; and in other cases the court interprets the contract as solely for the indemnity of the promisee."

A. Corbin, *Third Parties as Beneficiaries of Contractors' Surety Bonds,* 38 Yale L.J. 1, 12–13 (1928) (footnote omitted). *See also* Annotation, *Right of Person Furnishing Material or Labor to Maintain Action on Contractor's Bond to Owner or Public Body, or on Owner's Bond to Mortgagee,* 77 A.L.R. 21, 93–95 (1932).

Consequently in 1894, when the Heard Act required payment obligations to be combined in the performance bond on federal construction contracts, the statute further provided that unpaid creditors would be furnished a certified copy of the contract and bond

"upon which said person or persons supplying such labor and materials shall have a right of action, and shall be authorized to bring suit in the name of the United States for his or their use and benefit against said contractor and sureties and to prosecute the same to final judgment and execution: *Provided*, That such action and its prosecutions shall involve the United States in no expense."

An often cited case construing the 1894 Heard Act is *United States, to Use of Anniston Pipe & Foundry Co. v. National Sur. Co.*, 92 F. 549 (8th Cir.1899). There the court was required to determine whether a substantial alteration of the contractor's undertaking, without notice to the surety, absolved any obligation of the surety to suppliers. In that connection the court analyzed the Heard Act as follows:

"There was no occasion for legislation on the subject to which the act relates, except for the protection of those who might furnish materials or labor to persons having contracts with the government. The bond which is provided for by the act was intended to perform a double function,—in the first place, to secure to the government, as before, the faithful performance of all obligations which a contractor might assume towards it; and, in the second place, to protect third persons from whom the contractor obtained materials or labor. *Viewed in its latter aspect, the bond, by virtue of the operation of the statute, contains an agreement between the obligors therein and such third parties that they shall be paid* for whatever labor or materials they may supply to enable the principal in the bond to execute his contract with the United States. The two agreements which the bond contains, the one for the benefit of the government, and the one for the benefit of third persons, are as distinct as if they were contained in separate instruments, the government's name being used as obligee in the latter agreement merely as a matter of convenience."

*Id.* at 551 (emphasis added).

One legal writer of the era, discussing beneficiaries of the payment obligations under construction contractors' bonds,

explained the federal decisions as "necessarily governed by a special federal statute, giving the right of action on such policies to labor and material men, even when they run in name to the United States alone." T. Frost, *A Treatise on Guarantee Insurance* § 139, at 333 (1902).

The Heard Act was amended by the Act of February 24, 1905, ch. 778, 33 Stat. 81. The 1905 amendment, *inter alia*, gave the United States the exclusive right to sue on the combined payment and performance bond during the first six months following completion and final settlement of the construction contract. If the United States sued, unpaid suppliers could intervene. If the United States did not sue within six months, an unpaid supplier could sue if the action were commenced within one year after the performance and final settlement of the construction contract. Discussing the 1905 amended version of the Heard Act, the United States Supreme Court has said:

> "By this statute a right of action upon the bond is created in favor of certain creditors of the contractor. The cause of action did not exist before, and is the creature of the statute. The act does not place a limitation upon a cause of action theretofore existing, but creates a new one upon the terms named in the statute."

*United States ex rel. Texas Portland Cement Co. v. McCord*, 233 U.S. 157, 162, 34 S.Ct. 550, 552, 58 L.Ed. 893, 897 (1914).

This right to sue provision from the Heard Act was continued in the Miller Act, under which every unpaid supplier "shall have the right to sue on such payment bond...." 40 U.S.C. § 270b(a). The right to sue was picked up in the Maryland Little Miller Act of 1959 where former Art. 90, § 11(c) expressly provided that every unpaid supplier "shall have the right to sue on the payment bond...." That provision was carried forward through Code revisions to present FP § 17–108(a) which expressly provides that "a supplier may sue on payment security...." It is a familiar, if perhaps unwritten, rule for drafting statutes that one does not repeal something that may be important, even if the draftsperson

does not know why the provision is in an existing statute. Thus, a century after the Heard Act, the LMA continues to carry a provision that is duplicative of modern contract law relating to third party beneficiaries.

For all of the foregoing reasons, we hold that an "action under this subtitle," referred to in FP § 17–109(b), is an action on a payment bond. Consequently, the one year statute of limitations therein provided does not apply to the subject performance bond claim.

Our construction of "[a]n action under this subtitle" in FP § 17–109(b) is not inconsistent with the use of the quoted phraseology in the venue provisions of § 17–109(a) or in the costs provisions of § 17–109(c). The latter statute seemingly would bar the assessment of costs against a public body in the event an unpaid supplier captioned a payment bond action in the name of the obligee-public body to the use of the unpaid supplier. But see Maryland Rule 2–201 (real party in interest).[4]

*JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED AND CASE REMANDED FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY THE APPELLEE, FIDELITY & DEPOSIT COMPANY OF MARYLAND.*

---

**4.** By Chapter 97 of the Acts of 1994, FP § 17–109 was amended to substitute throughout "on a payment bond required by this subtitle" for "under this subtitle." We have given no consideration to the 1994 amendment in the decision of this case.